**STATE of Utah, Plaintiff and Respondent,**

v.

**Heber James NORTON, Defendant and Appellant.**

**No. 16911.**

Supreme Court of Utah.

Dec. 29, 1983.

Certiorari Denied April 16, 1984. See 104 S.Ct 1923.

Marlynn Bennett Lema, Price, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Earl Dorius, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

OAKS, Justice:

Two tellers were killed during the robbery of a bank in Huntington, Utah. A jury convicted defendant of first degree murder in those killings and sentenced him to death. He was also convicted of aggravated robbery and sentenced to five years to life, with an additional term not to exceed five years for the use of a firearm in that felony. On this appeal, defendant seeks to set aside the death penalty for alleged errors in the procedure used to impose it. He also seeks reversal of his conviction on the basis of various alleged errors, including denial of an instruction on the lesser included offense of second degree murder, refusal of a second change of venue, denial of mistrial due to a spectator's comment to a juror, and ineffective assistance of counsel.

The facts are undisputed. On February 22 and 23, 1979, defendant and an accomplice drove through several towns in southern Utah looking for a small trailer-type bank suitable for a one-man robbery. On the afternoon of the 23rd, defendant decided to rob the Huntington, Utah branch of Zion's Bank. He entered the bank, pointed a gun at one of the two tellers, and told her to fill his bag with money. When she took too much time, he shot her in the head. Then he ordered the second teller to fill the bag. When she spilled money on the floor, he ordered her around to the front of the counter to pick it up. While she knelt in front of him, he shot her also.

Several people witnessed defendant's escape from the bank. One witness followed him to a waiting car and memorized the car's description and license number. Ap-

proximately one hour after the crime, police spotted the car containing defendant and his accomplice and "herded" it into a roadblock. The officers obtained a warrant and searched the car. In the trunk, they found a bag of money and distinctive clothing matching the description of clothing worn by the bank robber. Witnesses identified defendant as the man they saw leaving the bank. While in custody, defendant signed a sworn confession, admitting that he committed the robbery and the murders. According to that confession, defendant decided to shoot the first teller because he had not worn a mask, and then, because he had shot the first teller, he decided he might as well shoot the second one.

## I. GUILT PHASE OF THE TRIAL

### A. Lesser Included Offense

Defendant contends that the trial court committed prejudicial error by refusing his request to have the jury instructed on the lesser included offense of second degree murder. The defense presented the testimony of a doctor who had examined defendant for a little over an hour on the day of trial. He testified that defendant exhibited symptoms of organic brain syndrome and that this condition caused defendant to "have [a] marked reduction in his ability to understand, to form intent, to plan, to reason." Characterizing this as evidence of "diminished capacity" to form the intent necessary for first degree murder, defendant argues that he was entitled to have the jury instructed on the lesser included offense of second degree murder.

■ At trial, the defense proffered a jury instruction that was apparently based on U.C.A., 1953, § 76–5–203(1)(d), the second degree felony murder provision.[1] However, that provision only applies when the defendant, during the commission of one of the enumerated felonies, causes the death of "another person *other than a party.*" (Emphasis added.) The purpose of the emphasized language was apparently to distinguish second degree felony murder from the first degree felony murder a defendant commits when he kills someone while he is engaged in one of the enumerated felonies. § 76–5–202(1)(d). For purposes of that distinction, a "party" is a person who is a victim of the enumerated felony. Here, as the district court concluded, the murdered employees were both immediate victims of the enumerated felony of aggravated robbery. As such, each was clearly a "party" within the meaning of § 76–5–203(1)(d). As a result, that provision is inapplicable, and the court was correct in refusing a defense instruction that invited the jury to convict defendant of second degree felony murder.

■ On appeal, defendant does not renew his insistence on the felony murder variation, but in his argument that the jury should have been instructed on second degree murder cites only § 76–5–203(1)(c), the so-called "depraved indifference" section. Under normal circumstances, defendant could not assign error in the omission of an instruction he failed to request at trial. *State v. Valdez,* 19 Utah 2d 426, 427–28, 432 P.2d 53, 54 (1967). However, on direct appeal in a capital case we will review the record for "manifest and prejudicial" error, even though no proper objection was made at trial. *State v. Wood,* Utah, 648 P.2d 71, 77 (1982); *State v. Cobo,* 90 Utah 89, 101–02, 60 P.2d 952, 958 (1936). Under the circumstances of this case, we find no such error.

■ The omission of a depraved indifference instruction was not error because the evidence in this case, including the evidence of diminished mental capacity, did not "pro-

---

**1.** (1) Criminal homicide constitutes murder in the second degree if the actor:

. . . .

(d) While in the commission, attempted commission, or immediate flight from the commission or attempted commission of aggravated robbery, robbery, rape, forcible sod-omy, or aggravated sexual assault, aggravated arson, arson, aggravated burglary, burglary, aggravated kidnapping, or kidnapping, causes the death of another person other than a party.
§ 76–5–203(1)(d).

vide a rational basis for *both* acquitting of the charged offense and convicting of the lesser included offense." *State v. Crick,* Utah, 675 P.2d 527 (1983); *State v. Baker,* Utah, 671 P.2d 152, 159 (1983); § 76–1–402(4).

■ If the jury believed the medical testimony, they could have *acquitted* defendant of the charged offense. They were instructed to acquit if they found that defendant, as a result of mental disease or defect, lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. But the evidence provided no basis for the jury to *convict* defendant of the depraved indifference variation of second degree murder. At the time of this shooting, that crime required proof that the accused had "recklessly" caused the death of another,[2] whereas this defendant admitted that he had deliberately shot the tellers. Thus, the evidence did not provide a basis to find that defendant's mental state was "reckless," as would be necessary to convict him of the proposed lesser included offense.

This circumstance is precisely like *State v. Dalglish,* 131 Ariz. 133, 639 P.2d 323 (1982), a first degree murder conviction in which a defendant urged error in the court's refusal to give an instruction on the variation of second degree murder involving reckless conduct under circumstances manifesting "extreme indifference to human life." The court rejected that contention for a reason that applies equally to this case: "It is clear from defendant's own testimony that as to the bullet which killed the victim, the shot was deliberate and intentional and not indifferent or reckless. An instruction on reckless conduct or indifference was not mandated or supported by the facts." *Id.* at 139, 639 P.2d at 329.

■ Nor did the evidence of diminished mental capacity provide the jury a rational basis to convict defendant of either of the two other variations of second degree mur-

der, since each of these requires proof of intent. § 76–5–203(1)(a) (intent to cause death); § 76–5–203(1)(b) (intent to cause serious bodily injury). There was no error in omitting an instruction on second degree murder.

## B. Change of Venue

■ On defendant's motion, the court granted a change of venue from Emery County to Carbon County. Defendant's second motion for a change of venue, to move the trial from Carbon County, was denied. After closely reviewing the record, we find no abuse of discretion in the court's denying this second motion. The relevant circumstances of this case are essentially identical to those in *State v. Pierre,* Utah, 572 P.2d 1338, 1348–50 (1977), where we found no error in the denial of a second motion for a change of venue. *See also State v. Wood,* Utah, 648 P.2d 71, 88–89 (1981).

## C. Mistrial for Statement Made to Juror

■ During a recess in the trial, an elderly man approached a member of the jury and said in a loud voice, "I made up my mind a long time ago; any time a guy walks in a bank and shoots two people, he deserves to die." The incident was immediately brought to the attention of the trial court. The court conducted a voir dire of the jury and determined that only one juror had heard this statement and that it had not affected that juror's ability to perform his function in an impartial manner. After reviewing the record, we are convinced that this event caused no prejudice to the defendant and that the court handled the matter appropriately. There was no error in denying defendant's motion for a mistrial. *State v. Andrews,* Utah, 576 P.2d 857, 858–59 (1978).

## D. Ineffective Assistance of Counsel

■ Finally, defendant contends that he was denied the effective assistance of coun-

---

**2.** U.C.A., 1953, § 76–5–203(1)(c), amended by 1979 Utah Laws ch. 74, § 1, deleting word *reck-*    *lessly.*

sel for his defense because of "the uncertainty of funds available to defense counsel for trial preparation." Several aspects of defense preparation are said to have been affected by this uncertainty, but the record shows no instance in which the defense asked for and failed to receive any resource that was shown to be important in the preparation or presentation of the defense. Measuring this contention against the rigorous standard of effective assistance of counsel we articulated in Codianna v. Morris, Utah, 660 P.2d 1101, 1109 (1983), we find no error.

Finding no error in the guilt phase of the trial, we affirm defendant's convictions for murder and aggravated robbery.

## II. THE DEATH PENALTY

Defendant's principal argument is that the death penalty should be set aside because the jury used the wrong standard in deciding whether he should be sentenced to death or life imprisonment.

■■■■ At defendant's penalty hearing, held in January 1980, in accordance with § 76–3–207, the jury was instructed as follows:

> There is no fixed standard as to the degree of persuasion needed for a particular sentence, as the law leaves that consideration to the jury but the burden of proof to satisfy the jury that a death sentence is appropriate is on the state.

In September 1981, while defendant's direct appeal from his conviction was pending, this Court held that the appropriate standard of persuasion in a penalty hearing in a capital case is "beyond a reasonable doubt" both as to the fact that total aggravation outweighs total mitigation and as to the conclusion that the imposition of the death penalty is justified and appropriate in the circumstances. State v. Wood, Utah, 648 P.2d 71 (1982). We agree with defendant's contention that the Wood standard of persuasion should apply to the decision on the death penalty in his case since his judgment of conviction was not final when Wood was decided.

In State v. Belgard, Utah, 615 P.2d 1274 (1980), we held that when this Court established a new rule on an essential element of a crime, a criminal defendant whose direct appeal was pending was entitled to the benefit of the new rule for the resolution of his appeal. That case involved a conviction for automobile homicide based on a jury instruction stating that the prosecution need only prove simple negligence. While Belgard's appeal was pending, this Court overturned earlier decisions and held that the prosecution had to prove criminal negligence. The State thereupon confessed error in Belgard's appeal. This Court accepted that confession, vacated the conviction, and remanded for further proceedings. Treating Belgard's case as a case of first impression, we relied on principles "well founded in comparable federal law" in holding that it was "clear from this scenario that defendant's judgment was not final at the time of our ruling in [State v.] Chavez [Utah, 605 P.2d 1226 (1979)] and accordingly he is entitled to claim the benefit of that ruling." 615 P.2d at 1275. That holding was fully supported by cited federal cases such as Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). It is also consistent with more recent holdings such as United States v. Johnson, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982) (new Fourth Amendment rule applied to all cases pending on direct appeal), and Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (rule in Lockett v. Ohio, 438 U.S. 586, 606, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978), applied to set aside death sentence pending on direct review when Lockett decided).

After reconsidering State v. Belgard as applied to the similar circumstances of this case, we reaffirm its holding. In doing so, we stress that Belgard's automatic rule of retroactivity only applies by its terms to criminal cases pending on direct review when the rule is changed. That vital qualification distinguishes this case from Andrews v. Morris, Utah, 677 P.2d 81 (1983), in which we held that as to criminal convictions already final before the Wood stan-

dard was established, the question of the application of the *Wood* standard would be governed by applying three factors to the circumstances of the individual case. *Id.,* at 84. On the basis of those factors, we held that petitioners whose convictions became final in 1977 did not have the benefit of the *Wood* standard in their second state collateral attack on that conviction.

■ We also stress that *Belgard*'s automatic rule of retroactivity as to nonfinal judgments only applies to significant changes of rules that are not expressly declared to be prospective in operation. This qualification is necessary to prevent automatic retroactivity from displacing the traditional rule that a new rule of criminal procedure which constitutes "a clear break with the past" will sometimes be nonretroactive. *United States v. Johnson,* 457 U.S. at 549, 102 S.Ct. at 2587. An appellate court needs the latitude to immunize a particular change of rule from the effect of automatic retroactivity in an appropriate case where this is consistent with constitutional principles.

At the opposite end of the spectrum, there are changes of a comparatively minor or evolutionary nature. As to these, the balance between the considerations of fairness to the defendant that motivate the rule in *Belgard* and the considerations of repose that would forestall a mandatory new trial with each change of rule may preclude automatic retroactivity as to all cases pending on direct review. Since the question of retroactivity as to rule changes of a minor or evolutionary nature is not before us in this appeal, we do not address it.

■ Measured against the reasonable doubt level of persuasion mandated in *Wood,* the instruction the jury used to determine whether this defendant should be sentenced to death was obviously in error. We have examined the evidence of aggravation and mitigation submitted to the jury and cannot say that this error was harmless on the facts of this case. The sentences of death must therefore be vacated, and the case must be remanded for resentencing.

## III.  PROCEEDINGS ON REMAND

For the guidance of the district court on remand, we proceed to consider the law that will govern the resentencing. These issues have been fully briefed by the parties.

### A.  Resentencing  Alternatives—Retroactivity and Ex Post Facto

Defendant argues that he must be sentenced to life imprisonment pursuant to the statute in effect when the crime was committed. That statute, quoted in the footnote,[3] specified a mandatory life sentence if reversible error was found only in the sentencing procedure. While defendant's appeal was pending in this Court, the Legislature repealed that statute and enacted a new direction on the procedure to be followed when an appellate court finds prejudicial error in the sentencing proceeding. Section 76–3–207(4), quoted in the footnote,[4] specifies a complete resentencing

---

**3.**   (3) Upon any appeal by the defendant where the sentence is of death, the supreme court, if it finds prejudicial error in the sentencing proceeding only, may set aside the sentence of death and remand the case to the trial court, in which event the trial court shall impose the sentence of life imprisonment.
§ 76–3–207(3) (repealed by 1982 Utah Laws ch. 19, effective Feb. 16, 1982).

**4.**   (4) Upon any appeal by the defendant where the sentence is of death, the appellate court, if it finds prejudicial error in the sentencing proceeding only, may set aside the sentence of death and remand the case to the

trial court for new sentencing proceedings to the extent necessary to correct the error or errors. No error in the sentencing proceedings shall result in the reversal of the conviction of a capital felony. In cases of remand for new sentencing proceedings, all exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing proceedings shall be admissible in the new sentencing proceedings, and:
  (a) If the sentencing proceeding was before a jury a new jury shall be impaneled for the new sentencing proceeding;

hearing, which includes the possible imposition of the death penalty. Defendant argues that application of this amendment to him would violate Utah's statutory law and the prohibition against ex post facto laws found in the United States Constitution art. I, § 9 and in the Utah Constitution art. I, § 18.

■■■■ Defendant's first argument is that § 68–3–3 precludes the application of the amendment to his resentencing. This section provides that "[n]o part of these revised statutes is retroactive, unless expressly so declared." Defendant argues that since the amendment contains no express language indicating its retroactive effect, it can only apply to crimes committed after its effective date. This argument ignores our long-standing exception to the general rule of nonretroactivity. Remedial and procedural amendments apply to accrued, pending, and future actions. *Department of Social Services v. Higgs,* Utah, 656 P.2d 998, 1000–01 (1982); *Boucofski v. Jacobsen,* 36 Utah 165, 104 P. 117, 119 (1909). For purposes of this exception, a case is pending "from the time of its commencement until its final determination upon appeal ...." *Boucofski v. Jacobsen,* 36 Utah at 172, 104 P. at 120. *See also Foil v. Ballinger,* Utah, 601 P.2d 144, 151 (1979) (amendment to statute of limitation applied to pending case) and cases cited in *In re J.P.,* Utah, 648 P.2d 1364, 1369 n. 4 (1982). This case clearly falls within the category of "pending" cases to which procedural amendments may apply.

■■■ The resentencing provision is a procedural statute. It has nothing to do with the substance of defendant's crime or even with the amount of punishment specified for it. The amendment may or may not affect the outcome when defendant is resentenced, depending upon the sentencer's determination after properly weighing the factors according to the burden of persuasion defined in *Wood.* The resentencing provision is not substantive because it does not "enlarge, eliminate, or destroy vested or contractual rights ...." *Department of Social Services v. Higgs,* 656 P.2d at 1000. Section 68–3–3 does not prohibit application of the amended sentencing statute on remand.

■■■■ Defendant argues that application of the amended statute to him would violate our constitutional prohibitions against ex post facto laws.[5] An ex post facto law is one that " 'punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed....' " *Dobbert v. Florida,* 432 U.S. 282, 292, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977), *quoting from Beazell v. Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 68–69, 70 L.Ed. 216 (1925). Such a law is constitutionally prohibited.

Defendant reasons that he had a "right" to a mandatory sentence of life imprisonment if error was found in the proceeding that led to his sentence of death, as provided in the statute in effect at the time of his trial. He argues that resentencing under the new statute would take away that "right" and increase his penalty from a definite life sentence to a possible reimposition of the death penalty. Defendant's ex post facto argument thus has two facets: (1) resentencing increases his punishment, and (2) resentencing takes away or impairs his "right" to be resentenced to life imprisonment.

(b) If the sentencing proceeding was before a judge, the original trial judge shall conduct the new sentencing proceeding; or

(c) If the sentencing proceeding was before a judge and the original trial judge is unable or unavailable to conduct a new sentencing proceeding, then another judge shall be designated to conduct the new sentencing proceeding.

§ 76–3–207(4).

**5.** This Court recognizes no distinction between the protection against ex post facto laws provided by the Utah and the United States Constitutions. *See State v. Coleman,* Utah, 540 P.2d 953, 954 (1975); *State v. Carrington,* 15 Utah 480, 50 P. 526 (1897).

Defendant's argument that resentencing under the amendment increases his punishment is without merit. The law in effect when defendant committed his crime provided two possible penalties upon conviction of first degree murder: life imprisonment or death. This has not changed. Upon resentencing, defendant will face the same alternatives he faced under the law in effect at the time of the crime: life imprisonment or death. The amendment did not increase his punishment for the crime. *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), relied on by the dissent, is not to the contrary. There, the reduction of "gain time" credits, which would extend defendant's required time in prison by over two years, was held ex post facto because it "increase[d] punishment beyond what was prescribed when the crime was consummated." *Id.* at 30, 101 S.Ct. at 965.

Defendant's real complaint is that the amendment takes away his "right" to be resentenced to life imprisonment. This argument fails. The ex post facto clause does not bar application of procedural changes to pending actions. *Dobbert v. Florida,* 432 U.S. at 292, 97 S.Ct. at 2297–2298. Defendant may have had an *expectation* that he would be automatically resentenced to life imprisonment, but the ex post facto clause does not prevent the State from depriving a criminal defendant of an expectation as to a defense or a procedure that has not yet accrued to his benefit.

This circumstance is directly analogous to one where a statute of limitations is extended after a crime has been committed. Courts universally hold that an extended limitations period can be applied to crimes committed before the amendment, where the limitations defense has not accrued to the defendant prior to the effective date of the amendment. *Falter v. United States,* 23 F.2d 420, 425–26 (2d Cir.1928); *Sobiek v. Superior Court,* 28 Cal.App.3d 846, 106 Cal.Rptr. 516 (1972). *See also United States v. Richardson,* 512 F.2d 105 (3d Cir.1975); *Clements v. United States,* 266 F.2d 397 (9th Cir.1959).

To the same effect is *People v. Anderson,* 53 Ill.2d 437, 292 N.E.2d 364 (1973), where the court rejected an ex post facto challenge in upholding the application of an amended statute to defendant's trial. At the time defendant was charged, Illinois statutes required the prosecution to commence a criminal trial within 120 days of defendant's demand or to dismiss the case with prejudice. While defendant's case was pending, the law was amended to increase that period to 160 days. Defendant was tried within 160 days, but not within 120 days. The court ruled that the amendment did not violate the ex post facto prohibition because it did not "deprive the defendant of any substantive right or defense available to her at the time of the offense." *Id.* at 441, 292 N.E.2d at 366.

While the defendants in the foregoing cases had an *expectancy* that the periods of limitation in effect when they committed their crimes would apply, the ex post facto clause did not preclude legislative extension of those periods where the expectancy had not accrued into a perfected defense before the amendment took effect. Thus, the defendants were not deprived of a right or a defense; they were merely deprived of an expectancy.

The instant case is comparable. While his appeal was pending and prior to the amendment, defendant "expected" that if prejudicial error occurred in his sentencing proceeding he would automatically receive life imprisonment. If he had already been resentenced to life imprisonment, the amendment obviously could not be applied to his case. But since defendant is to be resentenced after the effective date of the amendment, the defense or "right" under the old statute never accrued. Consequently, defendant can be resentenced under the amended statute without violating the ex post facto prohibition in Utah Constitution art. I, § 18.

Our interpretation is also consistent with the United States Supreme Court's interpretation of art. I, § 9 of the United States Constitution in analogous circumstances. In *Hopt v. Utah,* 110 U.S. 574, 4

S.Ct. 202, 28 L.Ed. 262 (1884), the Court affirmed a conviction partially based on the testimony of a convicted felon. When the crime was committed, a convicted felon was not a competent witness. This rule was amended after the crime and before the trial, and the witness was allowed to testify.

The crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute.... But alterations which do not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt, but—leaving untouched the nature of the crime and the amount or degree of proof essential to conviction—only remove existing restrictions upon the competency of certain classes of persons as witnesses, *relate to modes of procedure only, in which no one can be said to have a vested right, and which the State, upon grounds of public policy, may regulate at pleasure.*

*Id.* at 589–90, 4 S.Ct. at 210 (emphasis added). Notwithstanding the defendant's expectation that a convicted felon was incompetent to testify against him, a statutory amendment permitting that testimony was not ex post facto as to the defendant.

■ A statutory amendment does not violate the ex post facto clause merely because it works to the detriment of the accused. *Beazell v. Ohio,* 269 U.S. 167, 170 (1925), illustrates this principle in a case where two codefendants insisted that they be tried separately. At the time of the crime, the law required severance upon the request of any defendant. A later amendment making severance discretionary was applied to deny severance at defendants' trial. The Supreme Court found no ex post facto violation, despite each defendant's claim that evidence admitted against his codefendant would have been inadmissible against him and that inconsistent defenses prejudiced his ability to have a fair trial.

Similarly, in *Dobbert v. Florida, supra,* the Supreme Court rejected an ex post facto challenge to a death sentence. Under the facts of that case, petitioner would have received a mandatory life sentence under the statute in effect when he committed the crime, since the court would have been obliged to follow the jury recommendation to that effect. Under the amended statute, the defendant received the death sentence because the judge was free to (and did) disregard the jury's recommendation. "Even though it may work to the disadvantage of a defendant," the Court explained, "a procedural change is not ex post facto." 432 U.S. at 293, 97 S.Ct. at 2298.

Neither the holdings nor the language of *Hopt, Beazell,* or *Dobbert* was questioned in *Weaver v. Graham, supra,* which is relied on by the dissent. *Weaver's* broad statement that the "presence or absence of an affirmative, enforceable right is not relevant" was made in the context of its holding that "the *ex post facto* prohibition ... forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred." 450 U.S. at 30, 101 S.Ct. at 965. The well-established distinction between an increase in punishment, which is forbidden, and a change of procedure, which is permitted, was not questioned in *Weaver.* As to changes in procedure, the difference between an expectation and a defense or a procedure that has accrued to the defendant's benefit, discussed earlier in this opinion, remains important. The circumstances of the statutory change in this case are closer to the changes that were held not ex post facto in *Hopt, Beazell,* and *Dobbert* than to the increase of punishment forbidden in *Weaver.*

Even if detriment to the defendant was a factor to consider, the application in this case of the amended procedure in § 76–3–207(4) is not as clearly detrimental to defendant as the applications of the amended rules were to the defendants in *Hopt, Beazell,* and *Dobbert,* which found no ex post

facto violations. In this case, as discussed in Part II, *supra*, defendant claims that failure to apply the *Wood* standard at sentencing worked to his prejudice. In other words, defendant claims that the State would have been unable to meet its burden of persuasion for imposing the death penalty. On remand, defendant will be able to put the State to its correct burden of persuasion on that issue, thus erasing the prejudice he challenges on this appeal and putting him in the same position he would have occupied if the correct procedure had been followed in the first instance. If that can be considered detriment at all, it is clearly less detriment than the defendants suffered in *Hopt, Beazell,* or *Dobbert.*

Finally, contrary to the implication in defendant's argument, considerations of fairness pose no obstacle to the application of the amended statute to defendant. The key events in his case occurred in the following sequence: (1) crime committed (February 1979); (2) conviction and sentence after trial (January & February 1980); (3) defendant's initial brief filed in this appeal (February 1981); (4) pursuant to stipulation with defense counsel, State obtained indefinite extension of time to file its brief because of pendency of *Wood* case, which was expected to clarify issues on penalty phase of capital case; (5) *per curiam* opinion issued in *State v. Wood,* Utah, 648 P.2d 71 (1982), specifying appropriate jury instruction for burden of persuasion in penalty phase of capital case (September 1981); (6) amended § 76–3–207(4) enacted and effective (February 1982); (7) main opinion issued in *State v. Wood,* Utah, 648 P.2d 71 (1982) (May 1982); (8) State's brief (March 1983) and defendant's reply brief (May 1983) filed in this case.

Under the foregoing sequence, it is apparent that because his case was pending on appeal when *Wood* was decided, defendant has gained the *benefit* of retroactive application of that ruling to vacate his sentence of death, as explained in Part II herein. It is further apparent that because defendant's case was pending on appeal when the Legislature amended the resentencing provision, defendant will suffer whatever *detriment* may result from retroactive application of the procedure required by that statute on the remand required by *Wood.* The application of retroactivity principles in defendant's case has been evenhanded in each instance.

We conclude that as applied to the defendant the amended statute is not prohibited as ex post facto under the Utah Constitution or the United States Constitution.

### B. Arguments Against Capital Punishment

At defendant's first sentencing hearing, he proffered evidence regarding the deterrent effect of capital punishment and the average time and taxpayer cost involved in the appeal of a case involving the death penalty. Defendant contends that the court's exclusion of this evidence violated § 76–3–207(2), which provides that "the defendant shall be permitted to present argument ... against the sentence of death." We disagree. This section effectuates the constitutional requirement that a defendant be allowed to present any evidence in mitigation of *his* crime. *Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978). It was not intended to turn a sentencing proceeding into a forum to consider the appropriateness of capital punishment in general. That is an issue for the legislature, not the court. *Franklin v. State,* 245 Ga. 141, 263 S.E.2d 666, 673 (1980) (court properly excluded defendant's proffered testimony containing descriptions of executions and life on death row, statistics relating to executions, and religious and philosophical approaches to the death penalty).

### C. Exclusion of Jurors

At the voir dire, the court excused for cause a potential juror who indicated that she could not vote to impose the death penalty under any circumstances. This exclusion was proper under our decisions and those of the United States Su-

preme Court. *State v. Codianna,* Utah, 573 P.2d 343, 351 (1977); *State v. Redford,* 27 Utah 2d 379, 382–84, 496 P.2d 884, 887–88 (1972); *Lockett v. Ohio,* 438 U.S. at 595–96, 98 S.Ct. at 2959–2960; *Witherspoon v. Illinois,* 391 U.S. 510, 522–23 n. 21, 88 S.Ct. 1770, 1777 n. 21, 20 L.Ed.2d 776 (1968). *See also* § 77–35–18(e)(10) (enacted in 1980). Later, the court denied defendant's request that the potential jurors be asked the following question: "Is there any member of the panel who feels that if an individual is convicted of first degree murder, then the penalty must be death?" Defendant argues that the denial of this line of inquiry prevented him from identifying jurors who felt a "duty" to impose capital punishment, which resulted in a jury that was, at least potentially, "partial to the imposition of the death penalty" in violation of his constitutional right to an impartial jury.

Defendant relies on *Crawford v. Bounds,* 395 F.2d 297 (4th Cir.1968), which is distinguishable since it involved a sentence of death imposed by a jury known to contain one member who regarded the imposition of the death penalty as a duty.

In this case, in lieu of asking the proposed question, the trial court determined that all jurors were willing to follow the instructions of the court regarding what things they could consider in imposing sentence as the law provides. For the reasons explained below, we think the court should have asked the proposed question.

■■■ On the issue of capital punishment, the object of voir dire is to obtain a jury that can hear the evidence and apply the law without legal partiality for or against capital punishment. Approval of or opposition to capital punishment in general is not legal partiality for this purpose. As the Court observed in *Witherspoon v. Illinois,* "A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror." 391 U.S. at 519, 88 S.Ct. at 1775.

■■■ Persons who cannot vote for the imposition of capital punishment in any circumstances and persons who feel compelled to vote for the imposition of capital punishment in all circumstances of murder are properly excluded for cause. The proper test of legal partiality is whether a juror's views about capital punishment would prevent or substantially impair him or her from conscientiously taking the juror's oath and performing his or her duties as a juror by following the court's instructions on the law of capital punishment and applying them to the facts of the particular case. *Cf. Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980).

■■ In order to implement the defendant's interests in this familiar criterion for jury service in a capital case, we hold that the court should inquire, when so requested by the defendant, whether there are any jurors whose convictions would make them feel compelled to vote for capital punishment for all persons convicted of murder. Persons answering that inquiry in the affirmative should be excused for cause. Furthermore, the way the question is answered may be relevant to an intelligent exercise of a peremptory challenge. *See State v. Taylor,* Utah, 664 P.2d 439, 447 (1983). Other inquiries on this subject, if any, are left to the discretion of the trial court.

Defendant's convictions of first degree murder and aggravated robbery are affirmed. Defendant's death sentences are vacated, and the case is remanded to the trial court for a resentencing proceeding pursuant to § 76–3–207(4).

HALL, C.J., and HOWE and DURHAM, JJ., concur.

STEWART, Justice: (Concurring and dissenting)

I concur in Parts I and II of the majority opinion, except for that portion of Part I as to the standard to be used in determining whether a lesser-included offense instruction should be given.

However, I dissent from the holding in Part III that U.C.A., 1953, § 76–3–207(4), which requires a remand for resentencing to either life imprisonment or death when error is found in the initial sentencing procedure, may be applied to this particular defendant.

The statute that was in effect when the crime was committed, when the defendant was tried and sentenced, and when the defendant filed his appellate brief, required that he be sentenced to life imprisonment if the Court found error in the sentencing procedure.[1] That statute was amended to its present text in February, 1981—one year after the defendant filed his appellate brief. The State did not file its brief until March 15, 1983.

## I.

In my view, particularly in light of the above chronology, the majority's holding that § 76–3–207(4) may be applied retroactively makes that section a prohibited *ex post facto* law as to the defendant.

The majority relies on *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), to characterize the application of § 76–3–207(4) as procedural and therefore not violative of the *ex post facto* clause. The major portion of the *Dobbert* opinion, however, deals with facts different from the instant case. In *Dobbert*, the amended statute to be applied retroactively altered *who* would determine the punishment, not the *amount* of punishment. The majority seeks to make of § 76–3–207(4), the resentencing provision, a mere procedural change on the ground that it "has nothing to do with ... the amount of punishment" inflicted. Yet application of that

statute directly determines whether the defendant receives a mandatory life imprisonment or is subjected to a sentencing procedure where the death penalty may be imposed. Clearly, that does affect punishment and is not simply procedural, as was the statute in *Dobbert*.[2]

Other cases which the majority relies on and considers "directly analogous" or "identical" to the instant case involve changes in statutes of limitation and admissible evidence. Those matters are not analogous to the instant case; they have nothing to do with a possible increase in punishment.

More on point is *Weaver v. Graham*, 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), where the United States Supreme Court stated the two elements necessary for a statute to be *ex post facto:* it must be retroactive and disadvantageous to the defendant. The law "need not impair a 'vested right' to violate the *ex post facto* prohibition." *Id.* at 29, 101 S.Ct. at 964. Therefore, the majority's characterization of the defendant's present interest as an expectancy rather than a right is irrelevant to whether the statute is *ex post facto*. The Court in *Weaver* explained:

Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed *when the crime was consummated.* Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in

1. § 76–3–207(3). See majority opinion, footnote 3.

2. An additional issue in *Dobbert* was whether the amended death penalty statute should be applied to the defendant at all. Before the defendant committed the crime, the Florida death penalty was declared unconstitutional, but a second death penalty statute was enacted prior to his sentencing. The Court held that application of the second statute did not violate the *ex post facto* clause because the defendant had

"fair warning as to the degree of culpability which the State ascribed to the act of murder." *Id.* at 297, 97 S.Ct. at 2300. The "fair warning" that worked to the defendant's detriment in *Dobbert*, would seem to require fair notice in the instant case. The defendant not only had no warning that the death penalty statute would be amended, he had no reason to believe that the statutes in effect at the time of the crime would not be applied.

effect on the date of the offense. [Emphasis added.]

*Id.* at 30, 101 S.Ct. at 965.

Even though *Weaver* is not a death penalty case, its facts are applicable to the instant case. In *Weaver,* the defendant was convicted and sentenced while a statute which computed "gain time"[3] was in effect. Later, the statute was amended to calculate gain time in a way that was possibly detrimental to the defendant. The State argued in *Weaver* that the gain time calculation was not a part of the defendant's punishment. The Court found that the amended statute could require the defendant to serve more time than the initial statute. Of course, the amended statute did not increase his original fifteen year sentence, but increased the amount of the sentence he would be required to serve. Although the defendant would seemingly be in the same position as when he was sentenced, the Court held that if the statute were applied detrimentally to him it would violate the Constitution because it "substantially alters the consequences attached to a crime already completed, and therefore changes 'the quantum of punishment.'" *Id.* at 33, 101 S.Ct. at 966.

Similarly, in the present case, the amended statute alters the amount of punishment that may at this point be imposed on the defendant compared with the punishment authorized at the time of the illegal acts. If the method for determining gain time is not merely procedural when examined under the ex post facto clause, then it hardly seems consistent to call a statute that permits imposition of the death penalty a procedural change. Nevertheless, the majority claims that the defendant is in the same position now as when he committed the crime, that is, a sentence of either life imprisonment or death may be imposed on him. However, that reasoning misses the critical point. The defendant is in the same position only if the original statute on resentencing is ignored.

Additionally, the majority states that "the amendment may or may not affect the outcome when defendant is resentenced." That is not the test for determining whether a statute is detrimental and violative of the *ex post facto* clause. The test is whether the statute may be more onerous. *See Lindsey v. Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937). In *Lindsey* the Court stated, "[A]n increase in the possible penalty is *ex post facto,* regardless of the length of the sentence actually imposed." *Id.* at 401, 57 S.Ct. at 799 (citations omitted). The amended statute in the instant case clearly falls within the ambit of that rule.

## II.

Finally, this case was prolonged for over one year after the appellant filed his brief February 13, 1981, by the State's filing seven successive motions for continuances to file its brief. Had the brief been filed in the usual course of events, this Court could undoubtedly have decided the case when the old statute was still in effect. To permit a life or death decision to turn on the State's prolonging this case, for whatever reason, beyond the effective date of the new statute is a clear violation of due process of law.

---

**3.** Gain time statutes contain formulas that reduce a portion of a prisoner's sentence for good conduct.